UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| LARRY L. WOOD, <br><br> Plaintiff, <br><br> v. <br><br> ALLSTATE INSURANCE COMPANY, <br><br> Defendant. <br> ——————————————— <br> ALLSTATE INSURANCE COMPANY, <br><br> Counter-Claimant, <br><br> v. <br><br> LARRY L. WOOD, <br><br> Counter-Defendant. | Civil Action No. 3:11-CV-128-JVB |

**OPINION AND ORDER**

Larry Wood and his now deceased wife, Joyce, rented their Walkerton, Indiana home of almost forty years to their newish neighbors, the Webers, who proceeded to trash the place. To make matters worse, when the Webers finally vacated the premises after months of failing to pay rent, personal property or fixtures from the house were missing. Mr. Wood's home insurer, Allstate, denied his eventual claim for the losses, and he sued in state court for breach of contract and bad faith. Allstate removed to federal court on the basis of diversity jurisdiction and countersued for a declaratory judgment that it has no obligation to Mr. Wood for his claimed losses. The Court now addresses Allstate's pending global Motion for Summary Judgment, and Mr. Wood's Motion to Strike part of Allstate's reply brief.

The Court will grant Allstate's Motion as to the bad-faith claim, because Mr. Wood has no evidence Allstate acted with a culpable state of mind. Allstate's Motion will be denied as to much of the alleged breach of contract, however. Although Mr. Wood has no "dwelling" coverage for these losses because he was not living at the insured home, Allstate has failed to establish it is entitled to judgment as a matter of law with respect to the coverages for personal property and structures other than the dwelling. The Motion to Strike will be denied because, contrary to Mr. Wood's contention, Allstate had raised its nonresidency-based dwelling-coverage argument before its reply brief.

A. **BACKGROUND**

The Woods insured their home at 1204 Emerick Drive ("the Subject Premises") under an Allstate "Deluxe Homeowners Policy" from 1970 until Allstate cancelled in late 2010. Allstate does not allege the Woods breached their Policy obligations.

The following count among the most central features of the Policy:[1]

- "'You' or 'your'—means the person named on the Policy Declarations as the insured and that person's resident spouse." (Policy 2.)

- " 'Dwelling'—means a one, two, three or four family building structure, identified as the insured property on the Policy Declarations, where you reside and which is principally used as a private residence." (Id. at 3.)

- The Policy Declarations make "Larry L. & Joyce Wood" the "Named Insureds" and identify the property insured by the location 1204 Emerick Drive, Walkerton, IN 46574-9543.

- "'Insured person(s)'—means you and, if a resident of your household: a) any relative; and b) any dependent person in your care." (Id. at 2.)

- "'Residence premises'—means the dwelling, other structures and land located at the address stated on the Policy Declarations." (Id. at 3.)

---

[1] For the entire Policy, see docket entry 10-1.

- Notable undefined terms include "sudden and accidental," "direct," and "vandalism."

- The three Policy coverage categories germane to this Order, set out on pages 5 through 12 of the Policy, are "Dwelling Protection" under "Coverage A," "Other Structures Protection" under "Coverage B," and "Personal Property Protection" under "Coverage C."

- Dwelling Protection under Coverage A applies to "wall-to-wall carpeting fastened to your dwelling," certain "construction materials and supplies," and "[y]our dwelling including attached structures." (*Id.* at 5.)

- "Other Structures Protection" under Coverage B is for other structures "separated from your dwelling by clear space" or "attached to your dwelling by only a fence, utility line, or similar connection," as well as certain other construction materials and supplies, and "wall-to-wall carpeting fastened to other building structures." (*Id.*)

- Compensable losses under Coverages A and B include "sudden and accidental direct physical loss to property described in Coverage A—Dwelling Protection and Coverage B—Other Structures Protection except as limited or excluded in [the] policy." (*Id.* at 5.)

- Coverages A and B specifically exclude:

    o "wear and tear, aging, marring, scratching, [and] deterioration;"

    o "[t]heft from your residence premises while your dwelling is under construction, or of materials and supplies for use in construction, until your dwelling is completed and occupied;" and

    o "Vandalism and Malicious Mischief if your dwelling is vacant or unoccupied for more than 30 consecutive days immediately prior to the vandalism or malicious mischief."

    (*Id.* at 7.)

- Coverage C is for "[p]ersonal property owned or used by an insured anywhere in the world." (*Id.* at 8.)

- Coverage C specifically *includes*, with an irrelevant exception, "Vandalism and Malicious Mischief" and:

    sudden and accidental direct physical loss to the property described in Coverage C . . . , caused by: . . . 16. Theft, or attempted theft,

3

> including disappearance of property from a known place when it is likely that a theft has occurred. . . . We do not cover: . . . e) theft from that part of the residence premises rented by you to other than an insured person.

(*Id.* at 10.)

In fall 2008, Mr. and Mrs. Wood moved out of the Subject Premises, taking up residence three blocks away with their son and his wife. Around that time, Mr. and Mrs. Wood decided to rent the Subject Premises to the Webers, who had lived across the street from the Subject Premises for about a year and a half.

The Webers were occasionally late paying their rent, and Mr. Wood eventually decided not to renew their lease. Even by May 2010 or later, however, he claims he had "no concerns" about the Webers' treatment of his home, and he did not inspect the premises while the Webers inhabited them. Allstate, on the other hand, contends Mr. Wood knew the Webers were making significant changes to the house "months before" he informed Allstate of them. But according to Mr. Wood, it was not until mid-October 2010, when the Webers finally left the Subject Premises for good, that he discovered the havoc the Webers had wreaked. Mr. Wood describes the scene this way:

> In the kitchen a large table was missing, the floor was removed, a floor-to-ceiling cupboard was removed leaving exposed wires hanging from the ceiling, cabinets were damaged, the sink was unusable, the countertop was damaged, the floor was damaged, a cupboard was removed, light covers were removed, the appliances had been removed and the exterior door was damaged so that it could not be opened. In the dining room, heat registers were missing, baseboard was ripped off, ceiling fans were removed and panelling was taken off the walls. Throughout the home, ductwork, PVC, galvanized and copper pipes were removed. In the bathroom, the sink and walls were damaged and the pipes to the sink had been removed. Doors throughout the home had large holes in them. The attic trap door was missing. Windows throughout the home were missing or damaged. Bedroom closets were torn out and not replaced and drywall was damaged. A shelf above the basement stairs and the basement handrail were removed. The walls in the basement bedroom were damaged. A large furnace was replaced with a smaller

> furnace placed on top of pallets. Parts of the side porch were destroyed. The smoke detectors and thermostat were removed.

(Response 6–7 (citations omitted).)

Mr. Wood called his Allstate agent to report his claim in the third week of October 2010. He says delays ensued before an adjuster came to inspect. The adjuster responsible, Robert Boyer, did not keep his handwritten notes from the inspection, but he testifies that he transferred them into a claim log. Mr. Wood disputes making some of the statements Mr. Boyer attributes to him in the Allstate claim file.

During Mr. Boyer's inspection, he paid attention only to what Mr. Wood pointed out to him. Ultimately, Mr. Boyer determined Mr. Wood's claimed losses were not covered, in some instances because he found damage was not "sudden and accidental;" in others, he classified damage as wear and tear, found no damage, or considered changes to the property remodeling, or believed no vandalism or theft had occurred, or found that damage had resulted from a lack of maintenance.

Mr. Wood disagreed with Allstate's determination, and ultimately filed this lawsuit, in an Indiana state court. Allstate removed to this United States District Court, the parties completed discovery, and Allstate filed this Motion. Mr. Wood responded, and Allstate replied. Mr. Wood has also moved to strike a portion of Allstate's Reply, advancing that it raises a defense for the first time.

### B. SUMMARY-JUDGMENT STANDARD AND RELATED BURDENS

A federal district court grants a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion amounts to "put up or shut up" time, "when a

party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisc. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999), *unrelated dictum retracted by Higgins v. Mississippi*, 217 F.3d 951, 953–54 (7th Cir. 2000). The question for each claim is whether the evidence raises any set of reasonable inferences that would enable the nonmoving party to prevail. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") If so, the motion is denied; otherwise, granted. *See id.*

The allocation and the weight of the parties' evidentiary burdens at trial have a place in this summary-judgment analysis, as well.

The Court has not determined whether federal and state law conflict as to burden allocation for the breach-of-contract claim, but if there is a conflict, the issue should be governed by Indiana law. Neither party has raised a conflict-of-law issue in the summary-judgment briefs. *See R.E. Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("[W]hen neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). And the guiding principles in the event of a conflict likewise support applying Indiana law on the allocation of this burden. *See* Restatement (Second) of Conflict of Laws §§ 133, 134 (1971) (explaining the state rule governs the allocation of burdens if the primary purpose of the state rule "is to affect decision of the issue rather than to regulate the conduct of the trial"); *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 726–27 (Ind. Ct. App. 2004) (allocating the burdens as to an insurance-coverage issue on the basis of the "logic and organization" of insurance policies, not trial-management concerns); *Alexander v. Erie Ins. Exchange*, 982 F.2d 1153, 1157 (7th Cir. 1993) (looking to Indiana law for the

allocation of the burden of proving coverage under an insurance policy). Moreover, the parties have expressly agreed that Indiana law should govern "any and all claims or disputes in any way related to [their] policy." (Policy Endorsement at 2, DE 10-1 at 43.)

Indiana law assigns the burden of proof at trial to the party asserting the breach of contract. *E.g.*, *Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E .2d 1255, 1258 (Ind.Ct.App.1998); *see also* Ind. Model Civ. Jury Instr. No. 3309. In particular, the insured-plaintiff has the burden of showing coverage exists and that any relevant policy *exception* does not apply, but the insurer-defendant bears the burden in seeking to avoid liability on the basis of any *exclusion*. *See PSI Energy*, 801 N.E.2d at 725–27 (so assigning the burdens and explaining with reference to *Queen City Farms, Inc. v. Central National Insurance Company of Omaha*, 882 P.2d 703, 715 (Wash. 1994) a workable distinction between exceptions and exclusions).

It would be Mr. Wood's burden at trial to prove the bad-faith claim, as well, and it would be a particularly stringent one. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) ("To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability."); *see also Erie Ins. Co. v. Hickman ex rel. Smith*, 622 N.E.2d 515, 520 (Ind. 1993) (demonstrating that policy concerns, not trial-management issues, have motivated Indiana's general approach to the bad-faith tort in the insurance context). This has consequences for a motion for summary judgment: "where the substantive law mandates a 'clear and convincing' standard of proof, as in this case, the court in disposing of a summary judgment motion must consider whether a reasonable factfinder could conclude that the plaintiff had sufficient evidence to meet that burden." *McLaughlin v. State Farm Mut. Auto Ins. Co.*, 30 F.3d 861, 866 (7th Cir. 1994) (citing *Liberty Lobby*, 477 U.S. at 251).

C.  ANALYSIS

  *1.  Bad Faith*

An Indiana bad-faith claim[2] generally requires "evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (citation and quotation marks omitted), *discussed in Malone v. Reliastar Life Ins. Co.*, 558 F.3d 683, 695 (7th Cir. 2009) ("Evidence of bad faith in refusing to pay benefits or causing unfounded delays must demonstrate 'a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will.'"). The *Freidline* Court, cited above, stated it even more strongly: "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." 774 N.E.2d at 40. The erroneous denial of a claim, by itself, isn't bad faith. *Hickman*, 622 N.E.2d at 520.

And, under the reasoning of *Yancick v. Hanna Steel Corporation*, 653 F.3d 532, 548–49 (7th Cir. 2011), the applicability of which Mr. Wood does not contest, a burdened party cannot raise a reasonable jury inference of a particular mental state just by showing actions that may be unusual in the absence of the mental state. In *Yancick*, the Court ruled the plaintiff had failed to raise a triable issue of intent by showing that a possible wrongdoer, at the time only a few feet from his victim, "pushed down on [a] knob against spring-loaded pressure for seven seconds" when he "should not have been pressing down on any . . . knob." *Id.* at 548–49. The result was that a 940-pound coil hit the plaintiff's legs, severely injuring him. *Id.* at 943. He argued no one

---

[2] The Indiana bad-faith tort rests on insurers' obligations to refrain from "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Erie Ins. Co. v. Hickman ex rel. Smith*, 622 N.E.2d 515, 519 (Ind. 1993). Later cases may reveal that the bad-faith insurance tort entails still more duties under Indiana law, *id.*, but Plaintiff here has argued only an unfounded refusal to pay proceeds.

could be so careless or reckless, but the United States Court of Appeals for the Seventh Circuit rejected this as "mere speculation." *Id.* at 549.

By that standard, Mr. Wood's evidence of the mental state of bad faith cannot support more than speculation. He argues insurance companies must conduct a reasonable investigation and that reasonableness is a question of fact. But because negligence isn't necessarily bad faith, *see Hickman*, 622 N.E.2d at 520 ("[L]ack of diligent investigation alone is not sufficient."), that's no question of *material* fact.

Mr. Wood's effort to open a triable question of the mental-state element by saying Mr. Boyer neglected to inquire about all the damages listed in the claim file, documenting only what Mr. Wood showed him during the inspection, likewise fails. He offers that he never made some of the statements Boyer attributed to him in the claim file, and that this creates jury questions of credibility. "[A] jury may decide that Boyer falsified his claim notes and that doing do was an exercise of bad faith," Mr. Wood urges. And he might be onto something if incorrect claim notes were actionable as bad faith or if there were any evidence of malice or knowledge of a good insurance claim on Boyer's part. Neither condition is satisfied.

Mr. Wood concludes with an undeveloped argument that "[a] jury could also reasonably conclude that Allstate's delay in inspecting the property, delay in informing Wood of their decision to deny his claim, and cancellation of his policy before informing Wood of the claim denial are all evidence of bad faith toward their insured." These actions themselves would tell the jury nothing about Allstate's motivation and purpose, *see Yancick*, 653 F.3d at 548–49, so the Court disagrees. His evidence of an essential element of bad faith raises nothing better than speculation. *See id.*

The Court would therefore grant summary judgment as to this claim even if Mr. Wood's trial burden on bad faith were merely a preponderance of the evidence. The case for summary judgment in Allstate's favor on the bad-faith claim may be even stronger here, *McLaughlin*, 30 F.3d at 866, because Mr. Wood appears to bear a trial burden of clear and convincing evidence. *Freidline*, 774 N.E.2d at 40.

### 2. Breach of Contract

Allstate's most general summary-judgment arguments as to the alleged breach of contract are that Coverage A cannot apply to Mr. Wood's claimed losses because he did not reside at the address when the losses occurred, and Coverages B and C do not apply to his other losses, because they were not "sudden and accidental." Together, these arguments address the whole of Mr. Wood's breach-of-contract claim. Allstate also makes loss-specific arguments that there is no coverage for stolen personal property because of an exclusion for thefts from parts of the residence premises rented to other than insured persons, and that Mr. Wood has no evidence of intent to support a vandalism-based claim.

### a. No "Dwelling" Coverage

It is a critical point that Mr. Wood's Policy and Policy Declarations functioned jointly to define "dwelling" as the building structure at 1204 Emerick Drive, Walkerton, Indiana, *where he resided*. So for times when Mr. and Mrs. Wood did not live at 1204 Emerick Drive, their Policy provided them no dwelling coverage. Undisputedly, it was at precisely such a time that Mr. Wood's claimed losses occurred, so he has no protection from Coverage A as a matter of law.

Mr. Wood moved to strike a portion of Allstate's Reply brief dedicated to raising this point—for the first time, according to him. (DE 40.) But Mr. Wood has overlooked some things, and his Motion to Strike will be denied.

Allstate's pleadings preserved the argument in question simply by denying that it breached a contract with Mr. Wood. (Answer at 2.) After all, a covered loss is an element of Mr. Wood's claim, *Alexander*, 982 F.2d at 1157 (Indiana law), and non-residency at the Subject Premises is an exception, rather than an exclusion, from coverage. *See PSI Energy*, 801 N.E.2d at 725–27 (adopting an approach under which the insured bears the burden of showing coverage exceptions do not apply). Even if it weren't, Allstate also raised as "affirmative defenses" the following pertinent matters, some of which its denial had already placed at issue: "Defendant asserts . . . all defenses contained in the policy of insurance;" and "Plaintiff's claims are barred to the extent that this event does not constitute an accidental direct physical loss to property described in Coverage A Dwelling Protection and Coverage B Other Structures Protection."

Then, on page 18 of Allstate's opening brief supporting its Motion for Summary Judgment, it argued: "Because Plaintiff did not reside on the Premises when the damages occurred, his claim for damages to the residence is barred by the terms of the Policy which defines the insured dwelling as his residence." Although this contention would have been easier to find if Allstate had made it the subject of a heading in bold typeface, the Court notes that Mr. Wood's Response brief's "Argument" section contains no headings at all. It is inescapable Allstate raised the argument explicitly; Mr. Wood of all litigants can scarcely complain that it could have done so more conspicuously.

### b. Allstate Has Not Shown the Phrase "Sudden and Accidental" Entitles It to Judgment as to Non-Dwelling Coverages

Allstate has not put forth that Mr. Wood's absence from his Emerick Drive house precludes Coverage B or Coverage C. Instead, it contends Mr. Wood cannot prevail because he lacks evidence his Coverage B and Coverage C losses were "sudden and accidental" under his Policy, which defines neither "sudden," nor "accidental," nor "sudden and accidental."

Relying on *Cincinnati Insurance Co. v. Flanders Electric Motor Service, Inc.*, 40 F.3d 146 (7th Cir. 1994), Allstate claims that for this case, "sudden" means "both abrupt or quick." (Mem. Supp. Mot. Summ. J. 18.) In *Flanders Electric Motor Service*, the Seventh Circuit conscientiously predicted the Indiana Supreme Court would "conclude that the term 'sudden,' as it is used in the standard form comprehensive general liability policy, is unambiguous and means 'abrupt,' 'quick' or 'immediate,' as well as 'unexpected' and 'unintended.'" *Id.* at 154. Conscientious and reasonable though the prediction was, it proved incorrect. *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947–48 (Ind. 1996). The Indiana Supreme Court decided the phrase "sudden and accidental" in such a contract was ambiguous. *Id.* And, in Indiana, "[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer." *Id.* at 947 (citing *Fidelity and Deposit Co. of Md. v. Pettis Dry Goods Co.*, 190 N.E. 63 (1934)). As a result, the *Kiger* Court interpreted the phrase "sudden and accidental" in favor of more expansive coverage, such that it entailed no temporal aspect and meant only "unexpected." *Id.* at 947–48. Although neither party has cited a case interpreting the phrase "sudden and accidental" in the context of a homeowner's insurance policy, *Flanders Electric Motor Service* is Allstate's only case interpreting the term, and its construction of "sudden and accidental" clearly does not apply here. The meaning of "sudden and accidental" in this contract is not necessarily a question of fact, but it stands inadequately litigated to justify summary judgment.

Some of the items for which Mr. Wood is claiming a loss that are not personal property may constitute "structures" other than the dwelling within the meaning of Coverage B. Classifying each item as between Coverage B and Coverage C is not worth the effort here, because Allstate has not shown the exercise would conclusively rule out liability under either.

### c. Missing Items and Vandalism

Allstate seeks to avoid liability for Mr. Wood's missing items pursuant to an exclusion for personal property stolen "from that part of the residence premises rented by [the Woods] to other than an insured person." (Policy at 10, para. 15. e).) But summary judgment on this issue cannot be granted in Allstate's favor on the sole ground Mr. Wood lacks evidence the missing items weren't stolen. Indeed, in relying on Coverage C exclusion 15. e), it is *Allstate*'s burden to show the items *were* stolen. *See PSI Energy*, 801 N.E.2d at 727; *Hoosier Ins. Co. v. Audiology Found. of Am.*, 745 N.E.2d 300, 309 (Ind. App. 2001), *so interpreted in Home Fed. Sav. Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 732 (7th Cir. 2012) ("[T]he insurer bears the burden of showing that an exclusion applies.").

"Vandalism" is another component of Mr. Wood's claim. That term is undefined, so the Court will give it its ordinary meaning, *see Mikel v. Am. Ambassador Cas. Co.*, 644 N.E.2d 168, 170 (Ind. Ct. App. 1994) ("[I]n interpreting an insurance contract we give undefined terms their plain and ordinary meaning."), which entails *intentional* destruction or defacement of property.

Coverage B excludes vandalism only if the dwelling was vacant or unoccupied for more than 30 days, which Allstate has not argued, so there is no issue under Coverage B of the intent to damage Mr. Wood's property. Instead, the question for Coverage B is simply whether the loss

was direct, physical, "sudden and accidental." Thus, the summary-judgment argument with respect to any vandalism claim under Coverage B fails.

Coverage C, on the other hand, specifically *includes* losses caused by vandalism, with an inapplicable exception. Because Mr. Wood is relying on that provision to show coverage, which it is his burden to do, *PSI Energy*, 801 N.E.2d at 726–27, he needs evidence of intent to proceed on his vandalism theory under Coverage C. Under *Yancick*, 653 F.3d at 548–49, Mr. Wood cannot rely on the nature of the property damage alone to raise a reasonable jury inference of vandalism. He has no other evidence of the Webers'—or any other potential vandals'—mental state. Therefore, he has raised no triable factual issue of whether vandalism caused his personal-property losses so as to trigger Coverage C.

### D. CONCLUSION

Allstate's Motion for Summary Judgment (DE 30) is therefore **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **GRANTED** in Allstate's favor on the following of Mr. Wood's claims: bad faith and a breach of contract stemming from Coverage A or vandalism pursuant to Coverage C. The motion is **DENIED** as to the remainder of Mr. Wood's cause of action for breach of contract. This leaves Mr. Wood with a live claim for breach of contract under Coverage B and Coverage C, but not based on vandalism coverage under Coverage C.

His Motion to Strike (DE 40) is **DENIED**.

**SO ORDERED** on December 14, 2012.

                  s/ Joseph S. Van Bokkelen
                  JOSEPH S. VAN BOKKELEN
                  UNITED STATES DISTRICT JUDGE